UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

WILLIAM BARHAM,

                Plaintiff,

       v.                            Case No. 04-cv-4027-JPG

ALAN MCINTYRE, et al.,

                Defendant.

**MEMORANDUM AND ORDER**

**GILBERT, District Judge:**

**I.      Introduction**

On October 30, 2001, after a three-week bench trial, a Johnson County judge convicted William Barham of two counts of reckless homicide and one count of aggravated driving under the influence of alcohol. The judge sentenced Barham to four years' imprisonment. *Illinois v. Barham*, 788 N.E.2d 297, 299 (Ill. App. Ct. 5th Cir. 2003). The Appellate Court of Illinois, Fifth District, reversed Barham's conviction on April 1, 2003, and set him free. *Id*.

Barham believes the Johnson County State's Attorney's office and the Illinois State Police conspired to convict him wrongfully. He filed the instant action on February 18, 2004, naming as defendants Brian Trambley, the State's Attorney of Johnson County during his trial, Alan McIntyre, the assistant State's Attorney that tried the case, Roy Gilbert, a law clerk for the State's Attorney's office, and Jay Hall, Barbee Stalker, John Wright, Shane Alvey, and Pete Sopczak – all Illinois State Police officers involved in the investigation that culminated in Barham's conviction.

Five counts remain in the complaint. In Count I, titled "Deprivation of Right to Fair

Trial and for Wrongful Conviction," Barham alleges the individual defendants conspired to cause his "wrongful charging, prosecution, and conviction" and the "continuation of the wrongful conviction by failing to investigate, by fabricating . . . and . . . suppressing evidence that were the basis for the conviction . . . thereby unconstitutionally depriving [him] of his liberty and violating his right to a fair and impartial trial . . . as guaranteed by the Fourteenth Amendment." (Compl. at 8). Count II, titled "42 U.S.C. § 1983 Claim for False Imprisonment," alleges defendants falsely imprisoned Barham and continued his imprisonment, thereby "violat[ing] his Fourth and Fourteenth Amendment rights to be free from unreasonable seizures and the federal civil rights laws." (Compl. at 9). Count III is another claim under § 1983, alleging defendants violated Barham's right of access to the courts "by suppression of evidence favorable to the claims asserted here, and by effectively causing Mr. Barham to forfeit defenses to the charges, to delay his defense efforts and claims, and to proceed without key evidence that was destroyed, lost or otherwise diminished due to lapse of time" in violation of his Fifth and Fourteenth Amendment rights. (Compl. at 9-10). Count IV is a state law claim for false imprisonment and Count V is a state law claim for intentional infliction of emotional distress.

Now before the Court are a number of motions. Trambley, Gilbert, and McIntyre have filed separate motions for summary judgment and supporting memoranda (Docs. 93, 94, 95, 96, 98, 99) and Wright, Stalker, Hall, Alvey, and Sopczak have filed a combined motion for summary judgment and a supporting memorandum (Docs. 97, 100). Barham filed a combined response to these motions (Doc. 111) and defendants have replied to that response (Docs. 113, 116, 119). Wright, Stalker, Hall, Alvey, and Sopczak (the ISP defendants) have also moved to strike "all references in plaintiff's response to defendants' motion for summary judgment to Counts II and IV being something other than claims for false imprisonment." (Doc. 114).

Barham has responded to the motion to strike.  (Doc. 117).  Having reviewed the motions before it, the Court is now prepared to rule.

## II.     Background

A little before midnight on October 14, 2000, Barham – at that time, the Warden at Shawnee Correctional Center – and Jerry Isom were involved in a single-car accident that resulted in Isom's death.  Before the accident, they and others had been drinking at the Lakeside Bar and Grill after a political function.  The amount of beer Barham consumed was disputed at trial.  Barham testified that he had one or two during the four hours he was at the bar.  *Barham*, 788 N.E.2d at 305.  Three servers testified that between them, they served Barham at least eight.  No one testified that Barham was visibly intoxicated or out of control. In any event, it is undisputed that Barham was driving when he and Isom left the bar to go back home to Vienna, Illinois.  Barham maintains that the pair stopped at a convenience store on the way home, and that Isom took over driving responsibilities.  After the stop, Barham claims he fell asleep in the back seat.   Before reaching Vienna, the car went off the road and struck a tree.

Daniel Stockdale, a civilian, saw the accident while driving home from his girlfriend's house and stopped to see if anyone needed help.  When Stockdale approached the car, he saw Barham lying against the inflated air bag on the driver's side of the car.  Stockdale quickly went to his girlfriend's house and called the police.   His girlfriend's father, Charles James, accompanied him back to the wreck.  When they arrived, Barham was working his way out of the car.

Johnson County Sheriff's deputies were the first officials to respond, arriving at about 12:30 a.m.  Deputy Schierbaum noticed that Isom was pinned against the dashboard in the passenger seat of the vehicle.

Because of the severity of the accident, Johnson County officials referred the accident to the Illinois State Police (ISP). Wright, the shift commander when the call came in, sent an officer to the scene and immediately contacted his supervisor, Monica Joost. After ordering an accident reconstruction officer to the scene, Wright went there himself.

Hall was the first ISP officer at the scene. Stockdale told Hall what he had seen, including that he saw Barham in the driver's seat. Cheila Ellis, a paramedic who tended to Barham, told Hall she smelled alcohol on Barham's breath and thought him intoxicated. Hall smelled alcohol on Barham as well. Based on this information, Hall told Barham he was under arrest in the ambulance.

Alvey was the first accident reconstruction officer at the scene. Though he had completed ISP's crash reconstruction classes, he had not yet taken the state board examination to become certified and had not conducted any accident reconstructions. Given Alvey's inexperience, Wright eventually called another accident reconstruction officer to lead the reconstruction. Stalker responded to Wright's call. Based on her investigation, Stalker concluded that Barham was the driver of vehicle, that the vehicle was going faster than the posted 55 M.P.H. speed limit, and that Barham had failed to negotiate the turn.

Isom and Barham were taken to Lourdes Hospital in Paducah, Kentucky. Isom was pronounced dead shortly after his arrival. Hall went to Lourdes that night as well. Though the precise timing is not clear, at some point, he cited Barham for driving under the influence and improper lane usage. At around 2:30 a.m., hospital personnel told Hall that Barham's blood alcohol level was .097. At 3:32 a.m., Hall read Barham the "Warning to Motorist" instruction and asked for permission to draw blood. Since Barham was unconscious when Hall read the warning, Hall took the blood without his consent. The ISP draw indicated that Barham's BAC

was .046.  Sopczak is a crime scene investigator with ISP.  He first became involved with the case when he attended Isom's autopsy on October 16, 2000.  He took photographs during the autopsy, and went to the accident site, where he collected various pieces of evidence. Sopczak did not take fingerprints from the car or take a complete inventory.

Hall filed an Affidavit of Probable Cause on October 16, 2000, stating that to the best of his knowledge, Barham committed the crimes of reckless homicide and aggravated DUI.  A grand jury indicted Barham on three counts of reckless homicide and two counts of aggravated driving under the influence on December 5, 2000.

## III.   Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).  In determining the existence of a genuine dispute of material fact, the Court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath*, 211 F.3d at 396.

If the moving party meets its burden, the nonmoving party has the burden "to go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial."  *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006) (internal quotation marks and citations omitted); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).  A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the

5

parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts,"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, a genuine

issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving

party] on the evidence presented." *Anderson,* 477 U.S. at 252; *Insola v. Phillip Morris Inc.*, 216

F.3d 596 (7th Cir. 2000).

## IV.   Discussion

### A.   § 1983 Claims for False Arrest, False Imprisonment, and Malicious Prosecution

To succeed on a claim under § 1983, a plaintiff must plead and prove "(1) that he was

deprived of a right secured by the Constitution or laws of the United States, and (2) that the

deprivation was visited upon [him] by a person or persons acting under color of state law."

*Kramer v. Village of N. Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004).

Federal courts recognize constitutional torts for false arrest and imprisonment under the

Fourth Amendment and § 1983.  *See, e.g., Wallace v. City of Chicago*, 440 F.3d 421, 425 (7th

Cir. 2006); *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005) (*Ienco V*) ("[A] false arrest is

an unreasonable seizure prohibited by the Fourth Amendment.").   As the Supreme Court

explained in *Wallace v. Kato*, 127 S.Ct. 1091, 1095 (2007), "The sort of unlawful detention

remediable by the tort of false imprisonment is detention without legal process."  Thus, "a false

imprisonment ends once the victim becomes held pursuant to such process – when, for example,

he is bound over by a magistrate or arraigned on charges."  *Id*.  Once the detention is coupled

with legal process, the continued "detention forms part of the damages for the 'entirely distinct'

tort of malicious prosecution, which remedies detention accompanied, not by absence of legal

process, but by wrongful institution of legal process." *Id*.  ("From that point on, any damages

6

recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself."); *see Wiley v. City of Chicago*, 361 F.3d 994, 998 (7th Cir. 2004).

While the Supreme Court of the United States has not "explored the contours of a Fourth Amendment malicious-prosecution suit under § 1983," *Kato*, 127 S.Ct. at 1096 n.2; *see Albright v. Oliver*, 510 U.S. 266, 270-71 (1994) (plurality opinion), in the Seventh Circuit, "the existence of a tort claim [for malicious prosecution] under state law knocks out any constitutional theory of malicious prosecution." *Newsome v. McCabe*, 256 F.3d 747, 750-51 (7th Cir. 2001) ("[W]hen a state-law remedy exists . . . due process of law is afforded by the opportunity to pursue a claim in state court. . . ."); *see also Mays v. City of East St. Louis*, 123 F.3d 999, 1002-03 (7th Cir. 1997). As the common law tort of malicious prosecution exists in Illinois, an Illinois litigant cannot pursue a constitutional tort of malicious prosecution under § 1983. *See Newsome*, 256 F.3d at 751; *McCullah v. Gadert*, 344 F.3d 655, 658 (7th Cir. 2003).

The cases do not hold, however, that a wrongfully convicted petitioner is limited to state law claims and remedies when attacking an unconstitutional or otherwise illegal confinement. The Seventh Circuit has held that a petitioner may, in certain circumstances, bring constitutional claims "under the language of the Constitution itself," such as a claim for a so-called *Brady* violation. *Newsome*, 256 F.3d at 751. A petitioner has a *Brady* claim when the prosecutor or police "withheld material exculpatory details." *Id.* at 752 (citing *Brady v. Maryland*, 373 U.S. 83 (1963)); *Manning v. Miller*, 355 F.3d 1028, 1034 (7th Cir. 2004) ("[I]nvestigators who withhold exculpatory evidence from defendants violate the defendant's constitutional due process right."); *Ienco v. City of Chicago*, 286 F.3d 994, 998-999 (7th Cir. 2002) (*Ienco IV*).

**B.      Trambley, McIntyre, and Gilbert's Motions for Summary Judgment**

Trambley, McIntyre, and Gilbert contend they are entitled to absolute immunity because the evidence shows that they were all prosecuting attorneys (in Gilbert's case, a law clerk) acting within the scope of their authority.  They also contend they are entitled to summary judgment because probable cause supported Hall's decision to arrest Barham and the decision to prosecute, and, as to Counts IV and V, that they are immune from liability under Illinois' doctrine of public official immunity.

### i.      Malicious Prosecution: Counts I & III

### a.      Prosecutorial Immunity

Prosecutors have absolute immunity from damages actions for conduct that is "intimately associated with the judicial phase of the criminal process."  *Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)).  This immunity shields prosecutors when they act in their quasi-judicial capacity, but not when they act in an administrative or investigative capacity. *Id*. (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)); *see also Spiegel v. Rabinovitz*, 121 F.3d 251, 257 (7th Cir. 1997).  So long as a prosecutor acts within his quasi-judicial capacity, he cannot be liable even if he acted "maliciously, unreasonably, without probable cause, or even on the basis of false testimony or evidence." *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1238 (7th Cir. 1986).

To determine if prosecutorial immunity applies, the Court must look to the "nature of the function" the prosecutor performed.  *Buckley*, 509 U.S. at 269; *Spiegel*, 121 F.3d at 256.  The official seeking prosecutorial immunity bears the burden of showing that such immunity is justified.  *Buckley*, 509 U.S. at 269.

### b.      Trambley, McIntyre, and Gilbert's alleged Actions

Stated simply, Trambley, McIntyre, and Gilbert argue they took no untoward actions in

their investigative or administrative capacities.  They were not present[1] at the scene of the accident and did not assist Hall, Sopczak, Alvey, Wright, or Stalker in their investigations.

Barham contends that the State's Attorney's office "supervised" the investigation. Primarily, Barham relies on the testimony of Frank Cool, the State's Attorney's investigator, to support this allegation.[2]  During his deposition, Cool testified that he interviewed Isom's widow, Lori Isom, at McIntyre or Trambley's request, in the event she should testify at trial.  Cool took handwritten notes of the interview – which he gave to Trambley or McIntyre – and prepared a typed report.  This interview took place after Barham's indictment, a few weeks before the trial.

Even if the Court were to conclude that sending Cool to interview Isom's widow was an investigative function, which it almost certainly was not – see *Buckley*, 509 U.S. at 272-73 (reaffirming that a prosecutor's "out-of-court effort to control the presentation of [a] witness' testimony [is] entitled to absolute immunity because it [is] fairly within [the prosecutor's] function as an advocate.") (internal quotation marks omitted)) – Barham misses the point when he suggests that a prosecutor loses his immunity for acts taken in his prosecutorial role by engaging in an unrelated, investigatory action.  Not surprisingly, Barham has not supported this assertion, which runs counter to the functional approach set forth in *Buckley*.  *See Anderson v. Simon*, 217 F.3d 472, 475 (7th Cir. 2000).  Barham's real problem is his failure to identify any act taken by any State's Attorney defendant in a non-prosecutorial capacity that could support

---

[1] Trambley's only involvement on the night in question was his reception of a phone call informing him of the accident.  After he took the call, he went back to sleep.

[2] Barham also alleges that McIntyre directed the search of Barham's car.  Again, there is nothing in the record that shows that the search was unconstitutional.  Barham's remaining allegations are conclusory.  The Court will address Barham's allegations regarding the constitutional infirmity of the car's inventory below.

9

his liability on any of Barham's claims.

There is significant evidence, however, regarding the State's Attorney defendants' suppression of evidence.  Barham's criminal defense attorney, Randy Patchett, testified at his deposition that he repeatedly tried to interview Isom's widow, but McIntyre and the trial judge refused to grant the request on McIntyre's assertion that he did not intend to call her at trial.  In subsequent legal proceedings brought by Isom's widow, Cool testified that Isom's widow told him about a cell phone call she had with her husband shortly before the accident.  Before ending the conversation, Isom told her he was passing a particular campground on the highway.  According to Patchett, the widow's testimony was exculpatory because the time of the phone call coupled with the information about the campground would have shown that the car was traveling significantly slower than the State contended at trial.  The evidence suggests that Patchett was aware of the phone call before trial, however.

The State's Attorney's office also failed to produce the bar tab from the Lakeside Bar and Grill.  Patchett requested it, but they told him they did not have it and did not know where it was.  On the stand, an ISP witness told Patchett he had the bill.  After a recess, the officer brought the bill to Court.  According to the tab, Barham's party only ordered two Miller Lite's while there – the evidence at trial showed that Barham only drank Miller Lite.

The judge sent Gilbert to bring the Lakeside servers who testified they served Barham at least eight beers back to Court so Patchett could cross-examine them.  Patchett felt that "by the time they got back, they had already been well schooled in the issue" and lamented that he "did not get a chance to cross examine them without them knowing what the issue would have been." (Doc. 111 Ex. 113 at 21).  On the stand, one of the servers testified that Gilbert told her the bar tab had been found when he drove her back to court.

10

The State also failed to produce Isom's state-issued cell phone. As with the testimony of Isom's widow, Isom's phone would have potentially allowed Patchett to show the speed of the vehicle at the time of the crash.  McIntyre did not produce the wrecked car's "black box" – which collected various data from the car, including its speed – until shortly before trial.  This late disclosure kept Patchett and his experts from having the time to do an independent analysis.

Additionally, Patchett testified that defendants in this case have produced "hundreds of photographs" that they did not produce in the original case.  Stalker, for example, came to her deposition with "stacks" of photographs that were never produced.  (Doc. 111 Ex. 24 at 144-45). Patchett also testified that a number of ISP officers who were at the scene were not disclosed to him by the State's Attorney's office.

### c.    *Brady* Violations

In *Imbler v. Pachtman*, the Supreme Court held that prosecutors are immune from damages for § 1983 claims based on *Brady* violations.  424 U.S. at 431 n.34.  As such, Barham's *Brady* claims against the State's Attorney defendants fail.  *See, e.g., Villasana v. Wilhoit,* 368 F.3d 976, 979-80 (8th Cir. 2004); *Broam v. Bogan*, 320 F.3d 1023, 1030 (9th Cir. 2003).

### d.    Other, Non-Specific Constitutional Violations

In its cases interpreting the available § 1983 claims for malicious prosecution-type violations, the Seventh Circuit has left open the possibility of other claims arising "under the language of the Constitution itself."  *Newsome*, 256 F.3d at 751.  Though Barham does not hit upon this notion directly, he clearly attempts to ground the non-*Brady* aspects of his § 1983 claims on generalized due process violations.  The basis for these claims relates mostly to the conduct of the investigation – i.e., Gilbert coaching the witnesses before cross-examination, the failure to inventory the car properly, the failure to take fingerprints from the car, the "absurd"

11

conclusions of the accident reconstruction, and the failure to photograph and note the imprint on Isom's chest.  As the Court hinted above, however, Barham has not come forward with sufficient evidence to allow a jury to find that Trambley, McIntyre, or Gilbert directed or coordinated this conduct.  The Court will address whether these deficiencies are actionable as to the ISP defendants below.

### ii.        False Imprisonment Claims: Counts II & IV

As defendants rightly note, if probable cause supported Barham's arrest, his federal and state false imprisonment claims fail. *E.g., Morfin v. City of East Chicago*, 349 F.3d 989, 997 (7th Cir. 2003); *Martel Enters. v. City of Chicago*, 584 N.E.2d 157, 161 (Ill. App. Ct. 1st Dist. 1991).[3]

An arrest is supported by probable cause if, at the time of the arrest, "the facts and circumstances within [the arresting officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrestee was committing or had committed, a crime."  *Spiegal v. Cortese*, 196 F.3d 717, 725 n.1 (7th Cir. 1999) (internal quotation marks omitted).  The constitution does not require an arresting officer to "conduct an incredibly detailed investigation at the probable cause stage."  *Id*. at 724-25.

The ISP defendants contend that Hall did not really arrest Barham in the ambulance when

---

[3] Barham argues that Counts II and IV encompass more than just false imprisonment.  To the extent that Count II exceeds the scope of a federal false imprisonment claim, Counts I and III cover the field.  Count II would only be duplicative.  This is not necessarily the case in Count IV.  Count IV incorporates the allegations made in the first 35 paragraphs of the complaint, and asserts that the allegations state a claim for a state law false imprisonment.  If the court were to interpret Count IV as encompassing a state law malicious prosecution claim, *see Slaney v. Int'l Amateur Athletic Found.*, 244 F.3d 580, 600 (7th Cir. 2001), the existence of probable cause would defeat it as well. *Thomas v. Hileman*, 775 N.E.2d 231, 234 (Ill. App. Ct. 4th Dist. 2002); *Cult Awareness Network v. Church of Scientology Int'l.*, 685 N.E.2d 1347, 1350 (Ill. 1997).

he told him he was under arrest, arguing that Hall's subjective opinion as to the point of arrest was and is irrelevant.  *United States v. Jackson*, 377 F.3d 715, 717 (7th Cir. 2004).  Because Barham was already incapacitated and on his way to the hospital when Hall told him he was under arrest, they claim the statement and Hall's presence did not impede Barham's freedom. *United States v. Goodwin*, 449 F.3d 766, 768 (7th Cir. 2006).  As they see it, Barham was not actually seized until the Johnson County Sheriff arrested him pursuant to a warrant on October 24, 2000.[4]

In response to defendants' arguments about probable cause, Barham relies on the broader scope of his malicious prosecution arguments.  In fact, he does not even argue that his arrest was not supported by probable cause.  Having reviewed the facts of this case and the applicable law, the Court concludes that probable cause supported Barham's arrest, whether it occurred in the ambulance or later.

### iii.   Intentional Infliction of Emotional Distress

To succeed on a claim for intentional infliction of emotional distress, a plaintiff must plead and prove that defendant's conduct was "truly extreme and outrageous," that the defendant intended his conduct to inflict severe emotional distress, "or kn[ew] that there [was] at least a

---

[4] At this point they had the testimony of two witnesses putting Barham behind the wheel and Isom pinned in the passenger seat, they had the statement of the nurse at the hospital who said that his BAC was greater than the legal limit in Illinois, they had witnesses who smelled alcohol on Barham's breath, they had evidence that the vehicle was traveling too fast to negotiate the curve, and they had Isom's death. Given this information, they believe probable cause plainly existed.  *Lawrence v. Kenosha County*, 391 F.3d 837, 842 (7th Cir. 2004); *Braun v. Baldwin*, 346 F.3d 761, 766 (7th Cir. 2003); *Gramenos v. Jewel Comps.*, 797 F.2d 432, 440 (7th Cir. 1986).   Trambley, Gilbert, and McIntyre contend the arrest took place in the ambulance and that probable cause existed at that time as well.

high probability that his conduct [would] cause severe distress," and the conduct must in fact cause severe emotional distress. *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988).

The State's Attorney defendants contend that they are immune from this claim under federal law. To the extent that federal law does not provide immunity, they believe they are entitled to immunity under Illinois' doctrine of public official immunity. *See Aboufariss v. City of De Kalb*, 713 N.E.2d 804, 812 (Ill. Ct. App. 2d Dist. 1999). If federal law applies, as demonstrated above, defendants are no doubt immune. If state law applies, the answer is less clear because the cases generally hold that a public official is not immune if he acts willfully or maliciously. *See Midamerica Trust Co. v. Moffatt*, 511 N.E.2d 964, 969 (Ill. App. Ct. 5th Dist. 1987); *Hicks v. Williams*, 432 N.E.2d 1278, 1282 (Ill. App. Ct. 5th Dist. 1982).[5]

---

[5] Public official immunity is a common law doctrine that protects public officials from personal liability for the good faith performance of their discretionary duties. *Currie v. Lao*, 592 N.E.2d 977, 983-84 (Ill. 1992) (citing *Mora v. State*, 369 N.E.2d 868 (Ill. 1977)).

> The doctrine is premised upon the principle that a public decisionmaker should not be subject to personal liability where he makes a decision based upon his perception of the public needs. The immunity attaches only to conduct by a public official that is discretionary, rather than ministerial, in nature. Further, it is well established that public officials' immunity does not apply to every discretionary act by an official but rather only to those acts which are unique to the particular public office.

*Id.* at 984 (citations omitted). "Public official immunity is granted because a good-faith mistake in judgment ought not to subject a public decisionmaker to a lawsuit." *Moffatt*, 511 N.E.2d at 967. In deciding whether public official immunity applies, the critical question is whether the employee's conduct was discretionary or merely ministerial. *McKay v. Kusper*, 624 N.E.2d 1140, 1148 (Ill. App. Ct. 1993).

If an official acts in furtherance of his employer's purpose, he can engage in wilful and wanton conduct without exceeding his authority. *Janes v. Albergo*, 626 N.E.2d 1127, 1132 (Ill. App. Ct. 1st Dist. 1993). Where an official deliberately commits a wrongful act or acts maliciously, however, he is not entitled to public official immunity. *Moffatt*, 511 N.E.2d at 969; *Hicks*, 432 N.E.2d at 1282.

14

There are few reported decisions on the scope of a prosecutor's immunity from state law claims for torts relating to malicious prosecution. The majority have decided prosecutorial immunity questions without referencing the doctrine of public official immunity. *Compare White v. City of Chicago*, 861 N.E.2d 1083, 1088 (Ill. App. Ct. 1st Dist. 2006) (referencing and applying federal law), *Weimann v. Kane County*, 502 N.E.2d 373, 377 (Ill. App. Ct. 2d Dist. 1986), *and Coleson v. Spomer*, 334 N.E.2d 344, 347 (Ill. App. Ct. 5th Dist. 1975); *with Aboufariss*, 713 N.E.2d at 812 (applying state law) *and Illinois v. Patrick J. Gorman Consultants, Inc.*, 444 N.E.2d 776, 779 (Ill. App. Ct. 1st Dist. 1982). In the most recent case the Court's research has disclosed, *White v. City of Chicago*, the Appellate Court followed *Imbler*, *Buckley*, and other United States Supreme Court and Seventh Circuit cases without addressing Illinois law at all. 861 N.E.2d at 1088. The Illinois district courts go both ways. *Compare Carr v. City of Chicago*, No. 85-C-8322, 1988 WL 53153, at *3 (N.D. Ill. May 18, 1988) (finding that "absolute prosecutorial immunity extends to bar . . . state law claims of bad faith and malicious prosecution") *with Buckley v. County of DuPage*, No. 88-C-1939, at *8 (N.D. Ill. Jan. 9, 1996) (recognizing the potential for the narrower scope of state law immunity). The application of the doctrine of public official immunity rather than the interpretations of the federal courts did not prove dispositive in these cases.

Having reviewed the authorities, the Court believes the Supreme Court of Illinois would follow the Supreme Court of the United States and hold that absolute prosecutorial immunity extends to willful and malicious conduct. For the reasons given above, the Court finds that the State's Attorney Defendants are immune from Barham's claim for intentional infliction of emotional distress.

**C.    ISP Defendants' Motion**

The ISP defendants make six primary arguments in support of their motion. They contend (1) Barham's claims are time-barred, (2) the existence of probable cause supporting Hall's arrest bars the state and federal false imprisonment claims, (3) they had no duty to investigate Barham's claims of innocence, (4) they did not withhold exculpatory evidence, (5) they are immune from the state law claims based on sovereign and public official immunity, and (6) they are protected from the federal law claims under the doctrine of qualified immunity.

### i.        Timeliness of Barham's Claims

### a.        False Imprisonment Claims

The limitations period on false imprisonment claims in Illinois is two years. 735 ILCS 5/13-202. As *Kato* holds that false imprisonment ends "once the victim becomes held pursuant to [legal] process," Barham's § 1983 false imprisonment claim accrued, and the statute of limitations began running, at the latest, on the date of his conviction. 127 S.Ct. at 1095. As such, the statute of limitations ran – again at the latest – 2 years from October 30, 2001. Because Barham filed this action in February 2004, his § 1983 false imprisonment claim is time-barred. Barham has not directed the Court to any Illinois case that adopts a different rule for accrual on state law false imprisonment claims. Accordingly, the Court finds the state law false imprisonment claim barred as well.[6]

### b.        Counts I & III: Malicious Prosecution

Under *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994), a constitutional cause of action under § 1983 that impugns a criminal conviction does not accrue until the conviction is

---

[6] Barham attempts to bypass the statute of limitations with respect to Count II and IV by arguing that the allegations supporting the claims implicate malicious prosecution type violations. As the Court ruled above, Counts I and III cover the field for the federal law claim, and probable cause acts as a bar to a state law claim for malicious prosecution.

overturned.  *Kato*, 127 S.Ct. at 1097-98. This rule only comes into play, however, when "there

exists a conviction or sentence that has not been . . . invalidated."  *Kato*, 127 S.Ct. at 1097.

Because Barham's success on the malicious prosecution claims would impugn his conviction,

these claims did not accrue until April 1, 2003, the day his conviction was overturned. *Id*.

Accordingly, these claims are not time-barred.

### c.    Count V: Intentional Infliction of Emotional Distress

The limitations' period for intentional infliction of emotional distress claims is two

years.  *In re African-Am. Slave Descendants Litig.*, 375 F.Supp.2d 721, 773 (N.D. Ill. 2005);

*Dahl v. Fed. Land Bank Ass'n of W. Ill.*, 572 N.E.2d 311, 314 (Ill. App. Ct. 1st Dist. 1991).

Barham did not specifically respond to the statute of limitations argument with respect to this

claim.  As the ISP defendants point out, all actions taken by them that potentially gave rise to

this claim occurred not later than Barham's conviction on October 30, 2001.  Barham has offered

no reason why the statute should be tolled with respect to this claim, and the Court sees no

reason why the common law rule – that a "tort cause of action accrues, and the statute of

limitations commences to run, when the wrongful act or omission results in damages" – should

not apply.  *Kato*, 127 S.Ct. at 1097.

### ii.    Federal Malicious Prosecution Claims

The ISP defendants contend that they are protected from the remaining federal claims by

the doctrine of qualified immunity.  Government officials performing discretionary functions are

entitled to the defense of qualified immunity if "their conduct could reasonably have been

thought consistent with the rights they are alleged to have violated."  *Borello*, 446 F.3d at 746.

In evaluating qualified immunity claims, a court conducts a two-step inquiry: "First the court

must determine whether the disputed conduct, as alleged, violates a constitutional right; second,

the court must determine whether that right was 'clearly established' at the time of the alleged conduct." *Id*.

The Seventh Circuit has repeatedly held that law enforcement officers violate a person's due process rights when they withhold "information or evidence necessary for the fair and impartial trial guaranteed by the U.S. Constitution." *Ienco IV*, 286 F.3d at 999; *see also Newsome*, 256 F.3d at 752; *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). To the extent Barham has evidence to back up his *Brady* claims against the ISP defendants, they are not entitled to qualified immunity. *Ienco IV*, 286 F.3d at 1000.

Barham faults a number of aspects of ISP's investigation in this case. One of Barham's larger problems is ISP's failure to inventory the vehicle completely. For example, the officers failed to note that Barham's sport coat and glasses were in the backseat and that Isom's cigarettes were under the driver's seat. At his deposition, Patchett testified that it was inappropriate for the ISP officers not to take fingerprints of the steering wheel and the car keys. Patchett also saw problems with the photographs of the autopsy. According to Patchett, the coroner found a circular imprint on Isom's chest consistent with a steering wheel, but Sopczak and Stalker, who were present at the autopsy, took no pictures of it and never mentioned it in their reports. The medical examiner indicated in his report, however, that the injuries were consistent with that of a passenger in the right front seat. Barham also claims Isom's cell phone was with the ISP.

### A.     *Brady* Claims

There is ample evidence in the record to support Barham's *Brady* claims against the State's Attorney defendants, but they are immune. Unfortunately for Barham, he has not introduced any evidence to support his contention that the ISP defendants were complicit in

these wrongs.  Except for the photos Stalker brought to her deposition, there is no connection between the major pieces of exculpatory evidence withheld by Trambley and McIntyre – the Cool report, the bar tab, Isom's cell phone, and the black box – and the ISP defendants.

The Stalker photographs certainly had the potential to be exculpatory, but they are insufficient in themselves to support a *Brady* violation on Stalker's part for two reasons.  First, there is no evidence in the record that she failed to provide the photographs to the State's Attorney's office.  Second, Barham has not demonstrated that these photographs were in fact exculpatory.  Before trial, Patchett had photographs of the accident and was able to view the car and its contents.  Without any specific indication of how these photographs differed from those that Patchett had and showed something the others did not, the Court cannot find them sufficient to support a *Brady* claim.  The issue of Isom's cell phone presents a similar problem  There is no evidence that ISP or any named defendant withheld the phone from the State's Attorney's office. The simple fact that an unnamed ISP employee may have withheld the phone from the State's Attorney's office does not support an inference that one of the named defendants was involved. Barham has simply failed to show complicity on the part of any ISP defendant.

### B.     Non-*Brady* Conspiracy Claims

In support of the non-*Brady* conspiracy claims, Barham points to a number of things the ISP defendants did not do.  This includes Sopczak's failure to take a picture of the imprint on Isom's chest, the ISP defendants' collective failure to inventory the car, and their collective failure to take fingerprints of the steering wheel and the keys.  Barham has not linked these deficiencies with a specific, supported, and recognized constitutional violation.

 The Seventh Circuit has repeatedly held that once an officer has established probable cause on every element of a crime, "he need not continue investigating in order to test the

suspect's claim of innocence." *Spiegel*, 196 F.3d at 724 n.1.  Once officers determine that probable cause exists, they have "no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence." *Anderer v. Jones*, 385 F.3d 1043, 1049 (7th Cir. 2004).  As Barham has not shown that the ISP defendants withheld exculpatory evidence, and officers do not have a constitutional duty to uncover potentially exculpatory evidence, based on the facts in the record, the Court does not know of any constitutional claim available to Barham.  *See Gauger v. Hendle*, 349 F.3d 354, 358 (7th Cir. 2003) ("[W]itnesses, including police officers testifying for the prosecution in a criminal trial, have absolute immunity from a damages suit based on their testimony."), *overruled on other grounds by Wallace*, 440 F.3d at 423; *Mahoney v. Kesery*, 976 F.2d 1054, 1061 (7th Cir. 1992) ("[A] police officer who procures a prosecution by lying to the prosecutor or to the grand jury can be sued for the consequences of the prosecution."); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129-30 (2d Cir. 1997) (finding that a police officer could be held liable under § 1983 for presenting fabricated evidence to a prosecutor).  To the extent Barham has such a claim, his failure to cite any cases recognizing it in similar circumstances compels the conclusion that any rights the ISP defendants may have violated were not clearly established at the time of their conduct.  As such, they are entitled to qualified immunity.  *Borello*, 446 F.3d at 746-47.

V.      **Conclusion**

Defendants' motions for summary judgment (Doc. 93, 95, 97, 98) are **GRANTED**.  The Court **DENIES** the motion to strike (Doc. 114) as **MOOT**.  The Court **DIRECTS** the Clerk of

Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED: May 30, 2007**

  **s/ J. Phil Gilbert**             
**J. PHIL GILBERT**
**DISTRICT JUDGE**